IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-111-D

DR. JAMES H. JACKSON and JAMES H.      )
JACKSON IRREVOCABLE TRUST,             )
                                       )
                    Plaintiffs,        )
                                       )
        v.                             )          **ORDER**
                                       )
MINNESOTA LIFE INSURANCE               )
COMPANY; FIRST INSURANCE               )
FUNDING CORPORATION; AND               )
BARRINGTON BANK & TRUST                )
COMPANY, N.A.,                         )
                                       )
                                       )
                    Defendants.        )

On February 8, 2016, Dr. James H. Jackson ("Dr. Jackson") and the James H. Jackson

Irrevocable Trust ("the Trust") (collectively, "plaintiffs") sued Minnesota Life Insurance Company

("Minnesota Life"), First Insurance Funding Corporation ("First Insurance Funding"), and Barrington

Bank & Trust Company, N.A. ("Barrington") (collectively, "defendants") in Wake County Superior

Court [D.E. 1-1]. Plaintiffs assert six claims for relief arising under North Carolina law: fraud in

the inducement, negligent misrepresentation, breach of good faith and fair dealing, unfair and

deceptive trade practices, and two claims for breach of contract. On March 14, 2016, Minnesota Life

timely removed the action to this court [D.E. 1]. On April 20, 2016, Minnesota Life answered [D.E.

17], moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure

[D.E. 20], and filed a supporting memorandum [D.E. 21]. Also on April 20, 2016, First Insurance

Funding and Barrington answered [D.E. 18]. On May 10, 2016, First Insurance Funding and

Barrington moved for judgment on the pleadings under Rule 12(c) [D.E. 25] and filed a supporting memorandum [D.E. 26]. On May 11, 2016, plaintiffs responded in opposition to Minnesota Life's motion for judgment on the pleadings [D.E. 27]. On May 20, 2016, plaintiffs responded in opposition to First Insurance Funding and Barrington's motion for judgment on the pleadings [D.E. 29]. On May 25, 2016, Minnesota Life replied to plaintiffs' response in opposition [D.E. 30]. On June 3, 2016, First Insurance Funding and Barrington replied to plaintiffs' response in opposition [D.E. 31]. As explained below, the court grants defendants' motions for judgment on the pleadings.

## I.

In or around 2009, Dr. Jackson—then 68 years old—received marketing materials from Minnesota Life regarding one of its products called the Eclipse Indexed Life Policy ("the Policy"). See Compl. [D.E. 1-1] ¶¶ 15–17. Plaintiffs' complaint does not state whether Dr. Jackson solicited the materials. Under the Policy, the insured's annual premiums were invested in specified market funds and accumulated value based on the investments' performance. Id. ¶ 18. The marketing materials also listed lenders who offered a service known as "premium financing," including First Insurance Funding. Id. ¶¶ 19–20. Premium financing lenders advance the annual premiums due under a life-insurance policy. Id. ¶ 21. The insured or beneficiary pays the interest on those advances until the policy's investment returns can sustain the interest payments. Id. The policy's cash, or surrender, value serves as collateral for the loan's repayment. Id. Upon the insured's death, the policy's proceeds repay the loan's principal, and the beneficiary receives any surplus. Id.

In August 2009, First Insurance Funding and Minnesota Life provided Dr. Jackson with a "Plan Overview." Id. ¶ 22. The Plan Overview included illustrations (the "August 2009 Illustration") depicting the Policy's performance assuming $5,000,000.00 in coverage for Dr. Jackson, beginning at age 69, and $513,261.00 in annual premiums. Id.; Compl. Ex. A. First

2

Insurance Funding or its agent provided illustrations for the premium-financing loan based on $513,261.00 in annual premiums and a 5.5% interest rate. Compl. ¶ 22; Compl. Ex. A. The August 2009 Illustration projected the Policy's accumulated value and interest due under the premium-financing loan through the Policy's fourth year. Compl. ¶¶ 24–26.

The August 2009 Illustration also depicted index credits, which are how the Policy accumulates value. See id. ¶ 27. When a policyholder make a premium payment, the insurer allocates it to an "index segment." See [D.E. 21] 3–4. Each index segment tracks an investment-related market index and has a one-year life span. Id. At the end of that year, the insurer calculates an index credit based on the segment's value multiplied by both the participation rate and the segment's growth rate. Id. The product of that calculation—the index credit—is then credited back to the Policy's total accumulated value. Id.

In February 2010, Dr. Jackson and the Trust applied for the Policy and sought $5,000,000.00 in coverage for Dr. Jackson based on an age of 69 with the Trust as the beneficiary. Id. ¶ 30. At the same time, Dr. Jackson applied for a premium-financing loan with First Insurance Funding to finance the Policy's premiums. Id. ¶ 31. Based on the Plan Overview that Minnesota Life and First Insurance Funding provided, Dr. Jackson asked Minnesota Life to add a Surrender Value Enhancement Agreement ("SVEA") to the Policy. Id. ¶ 32. The SVEA provided that the Policy's surrender value would not fall below the total amount in premiums paid on the Policy in the first three years. Id. ¶ 33.

In March 2010, Minnesota Life approved Dr. Jackson's application and offered to issue him $5,000,000.00 in coverage with annual premiums of $513,260.54. Id. ¶ 35. Minnesota Life also confirmed that it would issue the Policy with an effective date of February, 9, 2010, so that Dr. Jackson's age under the Policy would be 69. Id. On March 23, 2010—before the Policy was

3

issued—Minnesota Life provided Dr. Jackson and the Trust with a document titled "Life Insurance Policy Illustration" (the "Minnesota Life March 2010 Illustration"), which contained numerous illustrations. Id. ¶ 38; Compl. Ex. B. Each illustration in the Minnesota Life March 2010 Illustration showed that an index credit had been applied to the Policy's accumulated value in the Policy's first year. Compl. ¶ 43. The Minnesota Life March 2010 Illustration also projected the Policy's accumulated cash value under various scenarios, ranging from "worst case scenario" to a modest rate of return. Id. ¶¶ 44–47.

On March 24, 2010, Dr. Jackson and the Trust signed the Minnesota Life March 2010 Illustration and returned it to Minnesota Life. See id. ¶ 48; Compl. Ex. B. After receiving the signed Illustration, Minnesota Life issued the Policy for $5,000,000 in coverage for Dr. Jackson effective February 9, 2010, at age 69. Compl. ¶ 49. The Policy included the SVEA. Id.

Also in March 2010, First Insurance Funding or its agent provided Dr. Jackson with a separate set of illustrations (the "First Insurance Funding March 2010 Illustration"). Id. ¶ 50; Compl. Ex. C.[1] The First Insurance Funding March 2010 Illustration indicated that, based on a 5.6% interest rate on the premium-financing loan and a 9.26% rate of return on the Policy, Dr. Jackson or the Trust would need to post an additional $100,159 in collateral in the Policy's fourth year. Compl. Ex. C. Based on the listed assumptions, the maximum amount of additional collateral required in any one year would be $165,673. Id. The First Insurance Funding March 2010 Illustration also showed that an index credit had been applied to the Policy's accumulated value in its first year. Id. ¶ 51.

On or about March 19, 2010, the Trust executed a promissory note (the "Loan" or "Note"), Dr. Jackson executed a personal guaranty, and the Trust executed a document assigning the Policy

---

[1] Plaintiffs' complaint does not state whether they received the First Insurance Funding March 2010 Illustration before or after they received the Minnesota Life March 2010 Illustration.

to First Insurance Funding as collateral to secure the Loan. Id. ¶ 53. The Loan listed defendant Barrington as the "Lender." Id. ¶ 54. First Insurance Funding took all actions as Barrington's agent. Id. ¶ 55.

Dr. Jackson and the Trust believed the August 2009 Illustration, the Minnesota Life March 2010 Illustration, and the First Insurance Funding March 2010 Illustration accurately and completely reflected the contract terms and anticipated performance for the Policy and Loan. Id. ¶ 58. Over the Policy's first three years, its underlying investments performed significantly better than the illustrations projected. Id. ¶¶ 73, 75–87. Nonetheless, the Policy's actual accumulated value was significantly less than projected because the illustrations' projections were based on an index credit being applied in the first year, when in reality no index credit was applied in the first year. Id. ¶¶ 73, 78. Thus, even though the index segment created during the first year earned a return of 8.48%—outperforming the assumed returns in the Minnesota Life March 2010 Illustrations—because an index credit based upon that segment was not applied in year one, the Policy's actual accumulated value fell significantly below that shown in the Minnesota Life March 2010 Illustrations, where an index credit had been applied. Id. ¶¶ 77–78. Because the index segment performed so well, the underlying index segment's performance did not cause the deviation between the Policy's actual accumulated value after the first year and the accumulated value shown in the illustrations. Id. ¶ 80. Rather, the deviation resulted from the allegedly false and misleading nature of the illustrations: specifically, the fact that an index credit had not been applied during the Policy's first year. Id. Because the Policy's actual accumulated value during the first year fell below the value shown in the some of the illustrations, the actual accumulated value during the second and third years also fell below the value shown in the illustrations due to the compounding nature of the index credits. See id. ¶¶ 73–87. The Annual Policy Reviews that Minnesota Life

5

issued at the end of each policy year to Dr. Jackson and the Trust reflected the actual index credits and accumulated value during each given year. Id. ¶ 74; Compl. Ex. D.

Plaintiffs allege that the SVEA hid the effect of these deviations between the Policy's projected value per the illustrations and the Policy's actual value. See Compl. ¶¶ 88–96. During the Policy's first three years, the SVEA ensured that the Policy's surrender value equaled the total amount in premium payments made. Id. ¶ 88. The SVEA thus fully secured the Loan during the Policy's first three years, meaning that First Insurance Funding did not require any additional interest payments or collateral above that shown in the illustrations. Id. ¶ 89. This fact allegedly prevented Dr. Jackson or the Trust from becoming aware of the discrepancy between the illustrations and the policy, or the effect of the deviation between the Policy's actual accumulated value and that shown in the illustrations. Id. ¶ 90

After the Policy's third year—when the SVEA lapsed—First Insurance Funding learned of the Policy's accumulated cash value and demanded that Dr. Jackson or the Trust pay the required $115,381 in interest plus approximately $375,000 in additional collateral for the Loan. Id. ¶ 91. This amount exceeded the First Insurance Funding March 2010 Illustration's projections that $100,159 would be due as additional collateral in the Policy's fourth year and that $165,673 would be the maximum additional collateral required in any one year. See id. ¶¶ 92, 94; Compl. Ex. C.

After First Insurance Funding's demanded additional collateral, Dr. Jackson and the Trust contacted both Minnesota Life and First Insurance Funding regarding the disparity between the illustrations' projected accumulated value and the actual accumulated value. Compl. ¶ 97. The parties agreed, without a written agreement, that Dr. Jackson and the Trust need not post additional collateral until February 22, 2013, defendants would not cancel the Policy until February 22, 2013, and Minnesota Life would extend the SVEA period until February 22, 2013. Id. ¶ 98. At that time,

6

the parties planned to review the newest index segment's performance and the index credit due, which they would know on February 15, 2013. Id. First Insurance Funding would thereafter adjust the additional collateral it required. Id. On February 12, 2013, plaintiffs learned that notwithstanding the alleged agreement, First Insurance Funding had directed Minnesota Life to terminate the Policy. Id. ¶ 99.[2]

On February 8, 2016, Dr. Jackson and the Trust sued Minnesota Life, First Insurance Funding, and Barrington in Wake County Superior Court for fraud in the inducement, negligent misrepresentation, breach of good faith and fair dealing, unfair and deceptive trade practices, and two claims for breach of contract. See [D.E. 1-1]. After Minnesota Life removed the action to this court, defendants filed their answers and moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.

## II.

This court has subject-matter jurisdiction based on diversity jurisdiction. Thus, the court applies state substantive principles and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002). Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." A court ruling on a Rule 12(c) motion applies the same standard as when deciding a Rule 12(b)(6) motion to dismiss. See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 375 (4th Cir. 2012).

A motion to dismiss under Rule 12(b)(6) tests the legal and factual sufficiency of the complaint. See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp.

_____

[2] The cancellation occurred on January 24, 2013. See [D.E. 17-5]. Plaintiffs apparently did not learn that the Policy had been cancelled until February 12, 2013. See [D.E. 27] 15 n.3.

v. Twombly, 550 U.S. 544, 570 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008); accord Erickson v. Pardus, 551 U.S. 89, 93–94 (2007) (per curiam). The court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009); see Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405–06 (4th Cir. 2002). The court need not, however, accept as true a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Nemet Chevrolet, Ltd., 591 F.3d at 255. Moreover, this court can consider documents relied on by the parties in their briefing if they are integral to and explicitly relied on in the complaint, and their authenticity is undisputed. See Occupy Columbia v. Haley, 738 F.3d 107, 117 n.7 (4th Cir. 2013).

A.

Defendants contend that the relevant statutes of limitation bar plaintiffs' claims for fraud in the inducement, negligent misrepresentation, unfair and deceptive trade practices, and one of their claims for breach of contract. Under the Rule 12(b)(6) standard applicable to Rule 12(c) motions, a Rule 12(c) motion "generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir.2007) (en banc). Nonetheless, a district court may reach the merits of an affirmative defense "if all facts necessary to the affirmative defense clearly appear on the face of the complaint." Id. (emphasis omitted). "A complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading, rendering dismissal appropriate." Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 181 (4th Cir. 1996) (quotation omitted). Failure to comply with the statute of limitations is therefore "a recognized basis

8

for dismissal on the pleadings" under Rule 12(c). <u>Evans v. Trinity Indus., Inc.</u>, 137 F. Supp. 3d 877, 881 (E.D. Va. 2015); <u>see</u> <u>West v. ITT Cont'l Baking Co.</u>, 683 F.2d 845, 846 (4th Cir. 1982).

1.

The statute of limitations bars plaintiffs' claim for fraud in the inducement. Plaintiffs allege that defendants presented plaintiffs with the illustrations knowing they were false and intending to deceive plaintiffs into believing they accurately reflected the Policy's terms, the manner in which index credits would be applied, and the future additional collateral payments required. Compl. ¶¶ 108–14. Although plaintiffs' complaint makes a fleeting reference to information regarding the additional collateral payments, their complaint primarily alleges that each of the illustrations contained one "critical omission": showing that an index credit had been applied to the Policy in the first year. <u>Id.</u> ¶¶ 61–72. The court therefore analyzes plaintiffs' claims based on the allegation that the illustrations misrepresented that an index credit would be applied in the Policy's first year.

A three-year statute of limitations governs North Carolina fraud claims. N.C. Gen. Stat. § 1-52(9); <u>Ussery v. Branch Banking & Trust Co.</u>, 368 N.C. 325, 333 n.5, 777 S.E.2d 272, 277 n.5 (2015). The limitations period for civil actions starts running whenever the plaintiff's cause of action accrues. N.C. Gen. Stat. § 1-15; <u>McCutchen v. McCutchen</u>, 360 N.C. 280, 283, 624 S.E.2d 620, 623 (2006). A cause of action for fraud accrues on the date the plaintiff actually discovered the alleged fraud, or reasonably should have discovered it in the exercise of due diligence. <u>Vail v. Vail</u>, 233 N.C. 109, 116, 63 S.E.2d 202, 207 (1951); <u>Carlisle v. Keith</u>, 169 N.C. App. 674, 683, 614 S.E.2d 542, 548 (2005). A plaintiff discovers fraud when he becomes "aware of facts and circumstances which, in the exercise of due care, would enable him or her to learn of or discover the fraud." <u>Jennings v. Lindsey</u>, 69 N.C. App. 710, 715, 318 S.E.2d 318, 321 (1984); <u>see</u> <u>Newton v. Barth</u>, 788 S.E.2d 653, 662 (N.C. Ct. App. 2016); <u>Spoor v. Barth</u>, 781 S.E.2d 627, 633 (N.C. Ct. App.), <u>review</u>

9

denied, cert. denied, 787 S.E.2d 38 (N.C. 2016), and review denied, cert. denied, 789 S.E.2d 4 (N.C. 2016). When fraud should have been discovered in the exercise of reasonable diligence is ordinarily a question for the jury. Forbis v. Neal, 361 N.C. 519, 524, 649 S.E.2d 382, 386 (2007). But the absence of reasonable diligence is established as a matter of law "where the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity to discover the fraud but failed to do so." State Farm Fire & Cas. Co. v. Darsie, 161 N.C. App. 542, 548, 589 S.E.2d 391, 396–7 (2003).[3] Defendants contend that plaintiffs had both the capacity and opportunity to discover the fraud at three alternative dates, all of which are more than three years before plaintiffs filed suit.

First, defendants argue that plaintiffs' receipt of the Policy in late March 2010 triggered the three-year statute of limitations because the Policy contained the terms by which index credits would be applied, which plaintiffs allege defendants misrepresented in the illustrations. In support, defendants note that the policyholder's net premium payments are held in an interim account. [D.E. 21] 3. The amount in the interim account is then transferred to the indexed account on the transfer date, which is "[t]he 3rd Friday of each month." Id.; see Policy [D.E. 17-1] 6.[4] Each transfer from the interim account to the indexed account on the transfer date created an index segment. [D.E. 21] 4; Policy [D.E. 17-1] 9. Each index segment had a life span of one year, which began on the transfer date. [D.E. 21] 4; Policy [D.E. 17-1] 5. After one year, an index credit would be calculated based

_____

[3] See State Farm Mut. Auto. Ins. Co. v. Gaylor, 190 N.C. App. 448, 451, 660 S.E.2d 104, 106 (2008); Shepard v. Ocwen Fed. Bank, FSB, 172 N.C. App. 475, 480, 617 S.E.2d 61, 64–65 (2005), aff'd, 361 N.C. 137, 638 S.E.2d 197 (2006); Piedmont Inst. of Pain Mgmt. v. Staton Found., 157 N.C. App. 577, 585, 581 S.E.2d 68, 73–74 (2003); Spears v. Moore, 145 N.C. App. 706, 708–09, 551 S.E.2d 483, 485 (2001); Grubb Props., Inc. v. Simms Inv. Co., 101 N.C. App. 498, 502, 400 S.E.2d 85, 88 (1991); see also Faircloth v. Fin. Asset Sec. Corp. Mego Mortg. Homeowner Loan Trust, 87 F. App'x 314, 319 (4th Cir. 2004) (per curiam) (unpublished).

[4] Plaintiffs did not attach the Policy to their complaint, but plaintiffs' complaint relies upon the Policy, and plaintiffs do not dispute its authenticity.

10

on the growth in the segment's underlying index and then credited to the Policy's accumulated value. [D.E. 21] 4; Policy [D.E. 17-1] 18. Taken together, the Policy shows that index credits would be applied one year from each transfer date, which is the 3rd Friday of the month following the policyholder's premium payment.

The Policy put plaintiffs on notice that an index credit would not be applied during the Policy's first year. Per plaintiffs' request, the Policy's effective date was February 9, 2010, so that Dr. Jackson's age at issuance would be 69. Thus, the Policy's first year ran from February 9, 2010, to February 9, 2011, but Minnesota Life did not actually issue the Policy until sometime after March 23, 2010. See Compl. ¶¶ 38, 48–49. The complaint does not state the date when Minnesota Life received the first premium payment, but Minnesota Life must have received plaintiffs' first premium some time after the Policy was issued in late March 2010. Based on the Policy's explanation of how index credits would be applied, plaintiffs were able to see that the premium would be transferred from the interim account to the indexed account on the third Friday of the month following receipt of the premium, or April 16, 2010. [D.E. 17-1] 6. The Policy also explained that an index credit would not be applied until roughly one year from the transfer date, when the index segment created from the transfer completed its one-year term. Id. at 18. Because this event would not occur until April 15, 2011, the Policy made clear that no index credit would be applied during the Policy's nominal first year, which plaintiffs knew would end on February 9, 2011, one year from its effective date.

Here, in the exercise of due diligence, plaintiffs should have discovered the alleged fraud relating to index-credit application when they received the Policy in late March 2010. At that time they were "aware of facts and circumstances which, in the exercise of due care, would enable [them] to learn of or discover the fraud." Jennings, 69 N.C. App. at 715, 318 S.E.2d at 321; see Newton,

11

788 S.E.2d at 662; Spoor, 781 S.E.2d at 633. Even if plaintiffs failed to grasp how and when index credits would be applied, "one who signs a paper-writing is under a duty to ascertain its contents, and in the absence of a showing that he was willingly misled or misinformed by the defendant as to its contents . . . he is held to have signed with full knowledge and assent as to what is therein contained." Williams v. Williams, 220 N.C. 806, 809–10, 18 S.E.2d 364, 366 (1942). Thus, when plaintiffs received the Policy, they had both the capacity and opportunity to discover the fraud, and the court can as a matter of law determine whether plaintiffs exercised due diligence. See Shepard, 172 N.C. App. at 480, 617 S.E.2d at 65; Faircloth, 87 F. App'x 314 at 319; see also Gaylor, 190 N.C. App. at 451, 660 S.E.2d at 106; Darsie, 161 N.C. App. at 548, 589 S.E.2d at 397; Piedmont Inst. of Pain Mgmt., 157 N.C. App. at 585, 581 S.E.2d at 73–74; Spears, 145 N.C. App. at 708–09, 551 S.E.2d at 485. On this record, plaintiffs did not exercise due diligence. Because plaintiffs did not file their complaint until February 8, 2016—nearly six years after they should have discovered the fraud—their fraud claim is time-barred.

In opposition, plaintiffs discuss Hunter v. Guardian Life Insurance Company of America, 162 N.C. App. 477, 593 S.E.2d 595 (2004). In Hunter, plaintiffs alleged that defendants sold them a life-insurance policy using illustrations showing that the policy would become self-sustaining after plaintiffs paid annual premiums for eleven years if dividends remained at the levels shown in the illustrations. 162 N.C. App. at 480, 593 S.E.2d at 598. Defendants allegedly knew when they sold plaintiffs the policy that the dividend projections were in fact unsustainable and would decrease over time. Id. Defendants asserted that the statutes of limitation barred plaintiffs' claims for fraud and negligent misrepresentation because plaintiffs should have discovered the misrepresentations upon receiving the policy based on the information about payments contained in the policy. Id. at 485, 593 S.E.2d at 601. The North Carolina Court or Appeals rejected this argument because "[i]n their

12

complaint, plaintiffs allege[d] they only recently discovered the acts of defendants and could not have discovered, with reasonable diligence, such acts until then." Id. at 486, 593 S.E.2d at 601.

Hunter is distinguishable. First, North Carolina state courts do not employ the plausibility standard set forth in Twombly, instead applying a more lenient notice-pleading standard. See, e.g., Fussell v. N.C. Farm Bureau Mut. Ins. Co., 364 N.C. 222, 227, 695 S.E.2d 437, 441 (2010). The barebones claim in Hunter that plaintiffs could not have discovered the misrepresentations upon receiving the policy sufficed in North Carolina state court, but does not suffice in federal court. Second, unlike the plaintiffs in Hunter, plaintiffs here do not allege that they could not have discovered the misrepresentations upon receiving the Policy. Instead, they allege that they did not discover the effects of the fraud upon receiving the Policy. [D.E. 27] 11. North Carolina law, however, does not focus on discovering the fraud's effects. Rather, it focuses on discovering the facts constituting the fraud. See N.C. Gen. Stat. § 1-52(9); see also Forbis, 361 N.C. at 524, 649 S.E.2d at 386; Jennings, 69 N.C. App. at 715, 318 S.E.2d at 321. Here that fact was that an index credit would not necessarily be applied during the Policy's first year, which the Policy made clear given its explanation of when index credits would be applied and plaintiffs' knowledge of the Policy's backdated effective date. Finally, in Hunter, plaintiffs alleged that the illustrations were based on dividend projections defendants knew were unsustainable, and defendants responded that plaintiffs should have discovered the alleged misrepresentations based upon provisions in the policy that apparently dealt with the number of premium payments required. Here, in contrast, plaintiffs allege that the illustrations misrepresented when index credits would be applied, but the relevant Policy provisions explained that concept directly. The Policy explicitly explained that the timing of index credits turned not on the Policy's effective date, but on when plaintiffs paid the premium. Thus, Hunter does not help plaintiffs.

13

Alternatively, defendants argue that if plaintiffs did not discover the alleged fraud upon receiving the Policy in late March 2010, they reasonably should have discovered it by February 9, 2011. On that date plaintiffs received the Annual Policy Review ("APR") for the Policy's first year. The APRs "reflected the actual index credits and accumulated value of the Policy in each year." Compl. ¶ 74. Plaintiffs received the APRs at the end of each Policy year, including the Policy's first year. See id. ¶¶ 75, 77. The APR issued at the end of the Policy's first year disclosed that no index credit was applied during that year. Compl. Ex. D at 46–47. That APR's first page lists the accumulated value as of February 9, 2011, along with an itemized list of all credits and charges to the accumulated value, and no index credit is listed. Id. at 46. The APR's second page explicitly shows "$0.00 " under "Index Credit." Id. at 47.

Because plaintiffs received the first APR in February 2011, at that time they were "aware of facts and circumstances which, in the exercise of due care, would enable [them] to learn of or discover the fraud." Jennings, 69 N.C. App. at 715, 318 S.E.2d at 321. Plaintiffs had both the capacity and opportunity to review this APR and notice that an index credit had not been applied during the Policy's first year. Thus, plaintiffs reasonably should have discovered the fraud no later than February 2011. Having filed suit on February 8, 2016, their fraud claim is time-barred.

In opposition, plaintiffs reframe the inquiry in order to postpone when the limitations period was triggered. They assert that they did not discover the fraud upon receiving either the Policy or the February 2011 APR because they did not "discover[] the effect of the false and misleading illustrations until First Insurance Funding required collateral nearly four times the illustrated amount." [D.E. 27] 11–12 (emphasis added). North Carolina law, however, does not inquire into when plaintiffs discovered or reasonably should have discovered the fraud's effect. Rather, it inquires into the "discovery . . . of the facts constituting the fraud." N.C. Gen. Stat. § 1-52(9)

14

(emphasis added); see Forbis, 361 N.C. at 524, 649 S.E.2d at 386; Jennings, 69 N.C. App. at 715, 318 S.E.2d at 321. This distinction matters. A plaintiff could discover a fraud, yet not know its effects until more than three years later. Plaintiffs' formulation would potentially postpone accrual of a fraud action beyond the time intended by the statute.

Alternatively, and in any event, plaintiffs' proposed "effects" inquiry would not save their fraud claim. Plaintiffs received two letters in January 2012 telling them precisely what the collateral requirements would be. See [D.E. 22].[5] On January 12, 2012, a letter projected the collateral requirements for the next five years. Id. at 2–4. On January 13, 2012, a second letter expressly stated that "[o]n or prior to December 11, 2012, you will need to post additional collateral in the amount of $349,764.00." Id. at 5. This collateral requirement exceeded that projected in the August 2009 and First Insurance Funding March 2010 Illustrations. Compare Compl. Exs. A & C, with [D.E. 22] 4. On February 1, 2012, the Trust's trustee signed and acknowledged the January 12, 2012 letter before a notary public. [D.E. 22] 6–7. Therefore, even under plaintiffs' proposed "effects" inquiry, their fraud action accrued no later than February 1, 2012. On that date plaintiffs were aware of facts and circumstances that enabled them to discover the alleged fraud's effects, and they had both the capacity and opportunity to do so. Plaintiffs did not file suit until February 8, 2016, more than three years later. Thus, the statute of limitations bars plaintiffs' fraud claim.

2.

Plaintiffs allege that defendants negligently misrepresented the manner in which index credits would be applied under the Policy and the amount of future additional collateral required of plaintiffs. Compl. ¶¶ 115–21. According to plaintiffs, defendants allegedly knew or should have

---

[5] Plaintiffs rely on the collateral demands in their complaint, and do not dispute their authenticity. See Compl. ¶¶ 91, 97.

known that plaintiffs were relying on the illustrations in determining whether to purchase the Policy or obtain the Loan, and as a result defendants owed them a duty to communicate accurate information and to use reasonable care in preparing the illustrations. Id. Assuming the truth of plaintiffs' allegations, plaintiffs' negligent-misrepresentation claim is time-barred.

A three-year statute of limitations governs negligent-misrepresentation claims. N.C. Gen. Stat. § 1-52(5); Ussery, 368 N.C. at 333 n.5, 777 S.E.2d at 277 n.5. The limitations period for civil actions starts running whenever the plaintiff's cause of action accrues. N.C. Gen. Stat. § 1-15; McCutchen, 360 N.C. at 283, 624 S.E.2d at 623. A negligent-misrepresentation claim accrues when the plaintiff discovers the misrepresentation, or reasonably should have discovered it in the exercise of due diligence, and suffers harm from it. Jefferson-Pilot Life Ins. Co. v. Spencer, 336 N.C. 49, 57, 442 S.E.2d 316, 320 (1994). "[T]he two requirements to trigger the statute of limitations in the case of a fraudulently procured insurance contract, both its discovery and the harm occurred thereby, will often occur simultaneously." Darsie, 161 N.C. App. at 556, 589 S.E.2d at 401.

Here, plaintiffs reasonably should have discovered the alleged misrepresentations at the same time they did for their fraud claim: upon receiving the Policy in March 2010, or, alternatively, upon receiving the first APR in February 2011 showing that an index credit had not been applied or signing the letter acknowledging the demand for additional collateral on February 1, 2012. Thus, whether the statute of limitations bars plaintiffs' negligent-misrepresentation claim turns on the additional requirement that such claims do not accrue until, in addition to discovering the misrepresentation, plaintiffs suffered harm from it.

Plaintiffs argue they were not harmed until First Insurance Funding and Barrington cancelled the Policy on February 12, 2013. Plaintiffs' complaint, however, contradicts that argument and states that "[t]his is an action to recover damages and expenses incurred after being induced and

16

misled by the Defendants to enter into an extremely expensive life insurance transaction," and that Dr. Jackson "would not have purchased the Policy and would not have entered into the Loan but for" the values depicted in the illustrations. Compl. ¶¶ 1, 59.

As for the Policy, plaintiffs were harmed by being improperly induced to purchase the Policy and pay its premiums. As for the Loan, plaintiffs were harmed by borrowing money to buy a policy they could not afford and then paying interest and fees on that borrowed money. Because plaintiffs were induced to purchase the Policy and take out the Loan more than three years before filing suit, plaintiffs' negligent-misrepresentation claim is time-barred.

Alternatively, if the harm did not occur when plaintiffs purchased the Policy, it occurred on February 9, 2011, when at the end of the Policy's first year an index credit was not applied. Not receiving the index credit deprived plaintiffs of thousands of dollars in value, and also triggered the requirement that plaintiffs post more collateral than they initially believed would be required of them because the Policy's value at the end of the first year was lower than expected, which in turn affected the Policy's future value given the compounding nature of the index credits.

Alternatively, to the extent plaintiffs allege they were harmed by being required to pay more collateral than they believed would be required of them based on the illustrations, plaintiffs suffered this harm in January 2012 when First Insurance Funding demanded additional collateral from them.

Under any of these theories of harm, plaintiffs' negligent-misrepresentation claim is time-barred. Although plaintiffs may also have been harmed when defendants cancelled the Policy on February 12, 2013, plaintiffs allege they were first harmed before that date. In North Carolina, the statute of limitations starts running when the plaintiff first suffers harm, not when the plaintiff suffers the most recent harm. See Jefferson-Pilot Life Ins. Co., 336 N.C. at 57, 442 S.E.2d at 320. Here, the complaint repeatedly asserts that plaintiffs were harmed when induced to purchase the Policy and

take out the Loan, when Minnesota Life failed to apply an index credit during the Policy's first year, and when First Insurance Funding and Barrington demanded additional collateral. Each of these events occurred, and plaintiffs discovered the alleged misrepresentations, more than three years before filing suit. Thus, the statute of limitations bars plaintiffs' negligent-misrepresentation claim.

3.

Plaintiffs claim that defendants engaged in unfair and deceptive practices by providing illustrations to plaintiffs that were false and/or misleading because they inaccurately reflected the Policy's terms, the manner in which index credits would be applied, and the additional collateral payments required of plaintiffs. Compl. ¶¶ 131–40. Plaintiffs proceed on two theories: first, that defendants violated N.C. Gen. Stat. § 58-63-15, as incorporated by N.C. Gen. Stat. § 75-1.1, and second, that defendants violated section 75-1.1 directly by engaging in fraud through providing the allegedly false and misleading illustrations. Section 75-1.1, referred to as the Unfair and Deceptive Trade Practices Act, or UDTPA, prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). Plaintiffs' UDTPA claim is time-barred.

A plaintiff must commence an action under section 75-1.1 within four years from the date the cause of action accrued. N.C. Gen. Stat. § 75-16.2; Shepard v. Ocwen Fed. Bank, FSB, 361 N.C. 137, 141, 638 S.E.2d 197, 200 (2006); Lockerman v. S. River Elec. Membership Corp., No. COA15-113, 2016 WL 7094063, at *7 (N.C. Ct. App. Dec. 6, 2016); Trantham v. Michael L. Martin, Inc., 228 N.C. App. 118, 126, 745 S.E.2d 327, 334 (2013). When a plaintiff bases his action for unfair and deceptive trade practices on fraud, "the action accrues at the time the fraud is discovered or should have been discovered with the exercise of reasonable diligence." Trantham, 228 N.C. App. at 126, 745 S.E.2d at 334 (alteration and emphasis omitted); see Lockerman, 2016 WL 7094063, at *7; Stony Point Hardware & Gen. Store, Inc. v. Peoples Bank, 214 N.C. App. 563, at *9, 714 S.E.2d

18

866, at *9 (2011) (unpublished table opinion); <u>Nash v. Motorola Comm's & Elecs., Inc.</u>, 96 N.C. App. 329, 331, 385 S.E.2d 537, 538 (1989), <u>aff'd</u>, 328 N.C. 267, 400 S.E.2d 36 (1991) (per curiam). As with fraud claims generally, for fraud-based UDTPA claims the exercise of reasonable diligence is ordinarily a jury question, but "where the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity to discover the mistake or discrepancy but failed to do so the absence of reasonable diligence is established as a matter of law." <u>Underwood v. Nw. Mut. Life Ins. Co.</u>, 149 N.C. App. 979, at *2, 563 S.E.2d 309, at *2 (2002) (unpublished table decision) (quotation omitted); <u>see</u> <u>Cebula v. Givens Estates, Inc.</u>, 235 N.C. App. 217, at *5, 763 S.E.2d 338, at *5 (2014) (unpublished table decision).

   As with the their fraud and negligent-misrepresentation claims, plaintiffs should reasonably have discovered the facts constituting the violation of section 75-1.1 no later than February 1, 2012, when they signed the letter from First Insurance Funding and Barrington acknowledging that additional collateral would be required beyond that depicted in the illustrations. The cause of action accrued no later than that date, and the statute of limitations expired on February 1, 2016. Accordingly, because plaintiffs did not file suit until February 8, 2016, plaintiffs' claim under section 75-1.1 is time-barred.

   Plaintiffs' claim based on N.C. Gen. Stat. § 58-63-15 is also untimely. Section 58-63-15 defines as "unfair and deceptive acts or practices in the business of insurance" the "[m]aking, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby." N.C. Gen. Stat. § 58-63-15(1). A plaintiff may bring an unfair and deceptive trade practice claim under section 75-1.1 on the ground that a violation of section 58-63-15 was an unfair or deceptive trade practice. <u>See</u> <u>Jefferson-Pilot Life Ins. Co.</u>, 336 N.C. at 53;

Cleveland Const., Inc. v. Fireman's Fund Ins. Co., 819 F. Supp. 2d 477, 484 (W.D.N.C. 2011). Thus, the four-year statute of limitations applicable to section 75-1.1 claims governs plaintiffs' claim for unfair and deceptive practices based on section 58-63-15. See Cleveland Const., Inc., 819 F. Supp. 2d at 484. A cause of action under section 75-1.1 accrues when the violation occurs. Hetzel v. JP Morgan Chase Bank, N.A., No. 413-CV-236-BO, 2014 WL 7336863, at *3 (E.D.N.C. Dec. 22, 2014) (unpublished); Cleveland Const., Inc., 819 F. Supp. 2d at 484; Hinson v. United Fin. Servs., Inc., 123 N.C. App. 469, 475, 473 S.E.2d 382, 387 (1996); Patterson v. DAC Corp. Of N.C., 66 N.C. App 110, 310 S.E.2d 783, 787 (1984).

Plaintiffs allege that defendants violated the UDTPA by providing illustrations that were false and misleading. Compl. ¶ 132. According to plaintiffs, however, defendants provided these illustrations in August 2009 and March 2010, more than four years before plaintiffs filed suit. Thus, plaintiffs' section 58-63-15 claim is time-barred.

4.

In their sixth claim, plaintiffs allege breach of contract. Specifically, plaintiffs allege that the illustrations were part of the Policy and Loan contracts, which defendants breached by failing to administer the Policy and Loan consistent with the illustrations. Compl. ¶¶ 141–44. The statute of limitations bars plaintiffs' breach-of-contract claim.

A three-year statute of limitations governs actions for breach of contract. N.C. Gen. Stat. § 1-52(1); Penley v. Penley, 314 N.C. 1, 19, 332 S.E.2d 51, 62 (1985). The limitations period for civil actions starts running when the plaintiff's cause of action accrues. N.C. Gen. Stat. § 1-15; McCutchen, 360 N.C. at 283, 624 S.E.2d at 623. A cause of action for breach of contract accrues when the breach occurs. MacDonald v. Univ. of N.C. at Chapel Hill, 299 N.C. 457, 463, 263 S.E.2d 578, 582 (1980). This principle holds true "regardless of whether the injured party has knowledge

20

that the breach has occurred." Mtn. Land Props., Inc. v. Lovell, 46 F. Supp. 3d 609, 626 (W.D.N.C. 2014); see Housecalls Home Health Care, Inc. v. N.C. Dep't of Health & Human Servs., 200 N.C. App. 66, 70, 682 S.E.2d 741, 744 (2009). Plaintiffs contend the illustrations were part of two separate contracts: one contract for the Policy between plaintiffs and Minnesota Life, and a second contract for the Loan between plaintiffs and First Insurance Funding and Barrington.

As for the Policy, plaintiffs do not explicitly state how Minnesota Life failed to administer the Policy consistent with the illustrations. But plaintiffs repeatedly allege in the complaint that the illustrations showed an index credit being applied in the first year, while one was not in fact applied, and imply that the alleged contract Minnesota Life breached was one to apply an index credit in the Policy's first year. Minnesota Life would have breached the alleged contract, and the claim therefore would have accrued, when Minnesota Life failed to apply an index credit when the Policy's first year ended on February 9, 2011. Because the alleged breach occurred more than three years before plaintiffs filed suit, the claim is time-barred.

As for the Loan, plaintiffs again do not explicitly state what obligation First Insurance Funding and Barrington allegedly breached. Yet any obligation would necessarily arise under the First Insurance Funding March 2010 Illustration, which depicted that the maximum amount of additional collateral required in any year would be $165,673. Breach of this allegedly enforceable obligation not to require more collateral than depicted would have occurred, at the latest, on February 1, 2012, when plaintiffs acknowledged First Insurance Funding and Barrington's demand for $349,764 in additional collateral. Because the alleged breach occurred more than three years before plaintiffs filed suit, the claim is time-barred.

5.

To save their time-barred claims, plaintiffs contend that defendants' alleged agreement to

21

extend the SVEA until February 22, 2013, and to wait until that date before requiring additional collateral or cancelling the Policy, tolled the statute of limitations until at least February 12, 2013, when the Policy was ultimately cancelled, or estops defendants from relying on the statutes of limitation as a defense. Plaintiffs offer no argument regarding how the alleged agreement tolled the statutes of limitation. Thus, they fail to carry their burden on this point. See Darsie, 161 N.C. App. at 549, 589 S.E.2d at 397; Tierney v. Garrard, 124 N.C. App. 415, 420, 477 S.E.2d 73, 76 (1996), aff'd, 347 N.C. 258, 490 S.E.2d 237 (1997).

As for equitable estoppel, the doctrine applies when one party's acts, representations, or silence induce another party to believe that certain facts exist, and that party rightfully relies and acts upon that belief to his detriment. Gore v. Myrtle/Mueller, 362 N.C. 27, 33, 653 S.E.2d 400, 405 (2007). Equitable estoppel bars application of the statute of limitations only when a plaintiff has "been induced to delay filing of the action by the misrepresentations of the defendant." Jordan v. Crew, 125 N.C. App. 712, 720, 482 S.E.2d 735, 739 (1997); see Trana Discovery, Inc. v. S. Research Inst., No. 5:13-CV-848-F, 2014 WL 5460611, at *8 (E.D.N.C. Oct. 27, 2014) (unpublished). Not just any delay, however, will do. Rather, the plaintiff must allege that relying upon the misrepresentation "prevented them from timely filing [the] action." Jordan, 125 N.C. App. at 720, 482 S.E.2d at 739 (emphasis added); see Trana Discovery, Inc., 2014 WL 5460611, at *8. Estoppel is a question of fact for the jury if "the evidence in a particular case raises a permissible inference that the elements of equitable estoppel are present, but other inferences may be drawn from contrary evidence." Miller v. Talton, 112 N.C. App. 484, 488, 452 S.E.2d 793, 797 (1993).

Even assuming defendants intended to induce plaintiffs to delay filing suit by agreeing to wait until February 22, 2013, before taking any action, that conduct would not have prevented plaintiffs from timely filing suit. The limitations period expired for plaintiffs' fraud and negligent-

22

misrepresentation claims no earlier than late March 2013, three years after plaintiffs received the Policy. For plaintiffs' claim for breach of contract based on the illustrations, the limitations period expired no earlier than February 9, 2014, three years after Minnesota Life failed to apply the first index credit, or February 1, 2015, three years after plaintiffs acknowledged First Insurance Funding's demand for more collateral than depicted. The earliest date when defendants contend the limitations period expired for plaintiffs' claim for unfair and deceptive practices is August 2013, four years after plaintiffs received the first illustration. Thus, the agreement, which defendants allegedly repudiated on February 12, 2013, would not have induced plaintiffs to file suit beyond the respective limitation periods. Accordingly, equitable estoppel does not apply. See Trana Discovery, Inc., 2014 WL 5460611, at *8; Jordan, 125 N.C. App. at 720, 482 S.E.2d at 739.

## B.

Defendants contend that plaintiffs fail to state a claim upon which relief can be granted for any of their causes of action. Rule 12(h) of the Federal Rules of Civil Procedure permits parties to raise the defense of failure to state a claim upon which relief can be granted via Rule 12(c) motion. Fed. R. Civ. P. 12(h)(2)(B); see Burbach Broad. Co. of Del., 278 F.3d at 405.

## 1.

Even assuming the statute of limitations does not bar plaintiffs' claim for fraud in the inducement, plaintiffs nonetheless fail to state a claim upon which relief can be granted. To state a fraud claim, a plaintiff must plausibly allege: "(1) [a] false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Forbis, 361 N.C. at 526–27, 649 S.E.2d at 387. "[A]ny reliance on the allegedly false representations must be reasonable." Id. at 527, 649 S.E.2d at 387.

Plaintiffs fail to plausibly allege they reasonably relied on any misrepresentations. Whether a plaintiff reasonably relied on a defendant's representations is ordinarily a question for the jury "unless the facts are so clear as to permit only one conclusion." Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP, 350 N.C. 214, 224–25, 513 S.E.2d 320, 327 (1999) (emphasis and quotation omitted). The facts permit only one conclusion when a plaintiff alleges reliance on misrepresentations that are "directly contradicted by a subsequent written agreement." Caper Corp. v. Wells Fargo Bank, N.A., 578 F. App'x 276, 282 (4th Cir. 2014) (per curiam) (unpublished). Reliance on such misrepresentations is unreasonable as a matter of law. Id.[6]

Here, even if the illustrations falsely represented that an index credit would be applied in the Policy's first year, plaintiffs as matter of law could not have reasonably relied on that representation. Plaintiffs knew that the Policy's first year would end on February 9, 2011, because they requested that Minnesota Life backdate the Policy's effective date to February 9, 2010. The Policy makes clear, however, that the timing of premium payments, not the effective date, determines when index credits get applied. The Policy explains that the first index credit would be created on the one-year anniversary of the first index segment. According to the Policy, the first index segment would be created three weeks after plaintiffs made the first premium payment. The first index credit would therefore not be created and applied until roughly one year and three weeks from the date plaintiffs

---

[6] See Davis v. Davis, 256 N.C. 468, 471–73, 124 S.E.2d 130, 133–34 (1962); Isley v. Brown, 253 N.C. 791, 793–94, 117 S.E.2d 821, 823–24 (1961); Eastway Wrecker Serv., Inc. v. City of Charlotte, 165 N.C. App. 639, 645–46, 599 S.E.2d 410, 414 (2004), aff'd, 360 N.C. 167, 622 S.E.2d 495 (2005); Int'l Harvester Credit Corp. v. Bowman, 69 N.C. App. 217, 219–220, 316 S.E.2d 619, 621 (1984); Allied Personnel of Raleigh, Inc. v. Alford, 25 N.C. App. 27, 30–31, 212 S.E.2d 46, 48–49 (1975); see also Am. Chiropractic Ass'n. v. Trigon Healthcare, Inc., 367 F.3d 212, 234–35 (4th Cir. 2004); Foremost Guar. Corp. v. Meritor Sav. Bank, 910 F.2d 118, 125–26 (4th Cir. 1990); Solum v. Certainteed Corp., 147 F. Supp. 3d 404, 411–12 (E.D.N.C. 2015); PNC Bank, N.A. v. Welsh Realty, LLC, No. 5:13-CV-203-BO, 2014 WL 4386064, at *3 (E.D.N.C. Sept. 5, 2014) (unpublished); SunTrust Mortg., Inc. v. Busby, 651 F. Supp. 2d 472, 484–86 (W.D.N.C. 2009).

made their first premium payment. Minnesota Life received Dr. Jackson's initial premium payment some time after March 29, 2010, the date plaintiffs accepted Minnesota Life's offer to issue the Policy by signing the Minnesota Life March 2010 Illustration. Under the Policy's express terms the first index credit would not be applied until after the first Policy's first year ended on February 9, 2011. Accordingly, plaintiffs could not reasonably rely on the illustrations' depictions that an index credit would per se be applied during the Policy's first year. Even if plaintiffs failed to grasp how and when index credits would be applied, "one who signs a paper writing is under a duty to ascertain its contents, and . . . he is held to have signed with full knowledge and assent as to what is therein contained." Williams, 220 N.C. at 809–10, 18 S.E.2d at 366.

Alternatively, plaintiffs fail to state a claim for fraud because "[w]here a plaintiff could have discovered the truth about the misrepresentation upon inquiry, the complaint must allege that the plaintiff was denied the opportunity to investigate or could not have learned the true facts by exercise of reasonable diligence in order to survive a motion to dismiss." Caper Corp., 578 F. App'x at 281 (alteration, emphasis, and quotation omitted); see Oberlin Capital, L.P. v. Slavin, 147 N.C. App. 52, 59–60, 554 S.E.2d 840, 846–87 (2001); Pinney v. State Farm Mut. Ins. Co., 146 N.C. App. 248, 256, 552 S.E.2d 186, 192 (2001); Hudson-Cole Dev. Corp. v. Beemer, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999). The closest plaintiffs come to alleging they were denied the opportunity to investigate or could not have learned the true facts by exercise of reasonable diligence is stating that the SVEA prevented them "from knowing or becoming aware of the false or misleading nature of the illustrations." Compl. ¶ 90; see [D.E. 27] 12. That argument fails. The SVEA guaranteed that the Policy's surrender value would not fall below the total amount in premiums paid on the Policy in the first three years. It did not affect the index-crediting process nor prevent plaintiffs from reading the Policy and its explanation of how index credits applied. Compl. ¶ 33. Instead, plaintiffs

assert that the SVEA prevented them learning of the alleged misrepresentation's effects, specifically that more collateral would be required later on than initially projected. Even assuming that was the case, plaintiffs do not allege that they were denied the opportunity to investigate or learn the facts about how index credits would be applied. Thus, plaintiffs fail to state a fraud claim.

2.

Even assuming the statute of limitations does not bar plaintiffs' claim for negligent misrepresentation, plaintiffs nonetheless fail to state a claim upon which relief can be granted. To state a negligent-misrepresentation claim, a plaintiff must plausibly allege that he justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care. Raritan River Steel Co. v. Cherry, Bekaert & Holland, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988); Brinkman v. Barrett Kays & Assocs., 155 N.C. App. 738, 742, 575 S.E.2d 40, 43–44 (2003). In a negligent-misrepresentation claim, the "question of justifiable reliance is analogous to that of reasonable reliance in fraud actions." Marcus Bros. Textiles, Inc., 350 N.C. at 224, 513 S.E.2d at 327 (quotation omitted). For both causes of action, whether the plaintiff reasonably relied on the defendant's representations is ordinarily a question for the jury "unless the facts are so clear as to permit only one conclusion." Id. at 224–25, 513 S.E.2d at 327 (emphasis and quotation omitted). As with fraud claims, one scenario where the facts permit only one conclusion arises when a plaintiff alleges misrepresentations that are "directly contrary" to the express terms of a written contract. Reliance on such misrepresentations is unreasonable as a matter of law. Int'l Harvester Credit Corp., 69 N.C. App. at 219–220, 316 S.E.2d at 621. Additionally, "[i]f the plaintiff could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." Songwooyarn Trading Co. v. Sox Eleven, Inc., 213 N.C. App. 49, 54, 714 S.E.2d 162,

26

166 (2011) (quotation omitted); Oberlin Capital, L.P., 147 N.C. App. at 59, 554 S.E.2d at 846–87.

Plaintiffs' negligent-misrepresentation claim fails for the same reason that their fraud claim fails. Plaintiffs could not have reasonably relied on any misrepresentations that contradicted the terms of the written Policy, and plaintiffs fail to plausibly allege they lacked the opportunity to investigate or could not have learned the facts by exercise of reasonable diligence.

3.

In their third claim for relief, plaintiffs allege that First Insurance Funding and Barrington breached an enforceable agreement with plaintiffs not to cancel the Policy until February 22, 2013. See Compl. ¶¶ 122–26. By letter dated December 11, 2012, First Insurance Funding reminded the Trust for the third time that it must post additional collateral by January 9, 2013, or else Barrington would "exercise its rights or remedies under the Note as a result of an Event of Default." [D.E. 22] 8. One of Barrington's rights upon default was to cancel the Policy and receive its surrender value. [D.E. 18-1] 6. The Trust failed to post additional collateral on the due date and thereby defaulted. Sometime after First Insurance Funding and Barrington demanded additional collateral, plaintiffs allege that the parties reached an unwritten agreement whereby plaintiffs were not required to post additional collateral until February 22, 2013, and that defendants would not cancel the Policy before then. See Compl. ¶¶ 97–98. Yet on February 12, 2013, First Insurance Funding directed Minnesota Life to terminate the Policy. Id. ¶ 99.

Plaintiffs' claim fails because any agreement not to cancel the Policy notwithstanding plaintiffs' default would amend the plain terms of the Note. New York law governs the Note. [D.E. 18-1] 9. Under New York law, "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom

27

enforcement of the change is sought or by his agent." N.Y. Gen. Oblig. Law § 15-301(1) (McKinney). The Note incorporates this requirement in providing that "[n]o provision of this Note shall be waived, modified or limited except by a written agreement signed by Lender and Borrower." [D.E. 18-1] 9. The alleged agreement preventing First Insurance Funding and Barrington from cancelling the Policy upon plaintiffs' default is a modification of the Note's express terms and thus needed to be in writing and signed by the parties.

In opposition, plaintiffs make two arguments. First, plaintiffs contend that the record does not establish that a writing sufficient under New York law does not exist and that any writing corroborating the agreement would be in First Insurance Funding or Barrington's possession, meaning plaintiffs should "be allowed to discover the existence of such a writing." [D.E. 29] 5–6. Plaintiffs, however, must plausibly allege the existence of a written agreement. It is not the court's responsibility to fill the gaps in plaintiffs' case by speculating that a written agreement might exist and that it might be in First Insurance Funding or Barrington's possession if it does. Likewise, First Insurance Funding and Barrington are not required to submit to discovery to prove the non-existence of a written agreement the existence of which is not supported by any plausible allegation.

Next, plaintiffs assert that they need not show a written agreement under the doctrine of equitable estoppel. "There are two exceptions to the no-oral-modifications rule: partial performance and equitable estoppel." Vill. On Canon v. Bankers Trust Co., 920 F. Supp. 520, 527 (S.D.N.Y. 1996); see Latham Four P'ship v. SSI Medical Servs., Inc., 182 A.D.2d 880, 881, 581 N.Y.S.2d 891, 893 (1992). "Once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification." Rose v. Spa Realty Assocs., 42 N.Y.2d 338, 344, 366 N.E.2d 1279, 1283 (1977); see Club Haven Inv. Co. v. Capital Co., 160 F. Supp. 2d 590, 592 (S.D.N.Y. 2001);

28

Latham Four P'ship, 182 A.D.2d at 881. Additionally, "conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written." Rose, 42 N.Y.2d at 344, 366 N.E.2d at 1283; see Club Haven Inv. Co., 160 F. Supp. 2d at 592; Parker v. Navarra, 102 A.D.3d 935, 937, 958 N.Y.S.2d 754, 756 (2013).

Plaintiffs contend they relied on First Insurance Funding and Barrington's alleged agreement not to require additional collateral or cancel the Policy by not taking adverse action against the two defendants and by extending the SVEA period until February 22, 2013. Plaintiffs also contend that, absent an agreement, their decision to extend the SVEA period, the parties' decision to wait for the third index credit, and Minnesota Life's consent to the SVEA's extension would not make sense because "actions beyond the original February 9, 2013 SVEA expiration date would have been pointless and irrelevant." [D.E. 29] 8.

This argument fails for at least two reasons. First, plaintiffs fail to plausibly allege "significant and substantial" reliance. For example, they do not allege that they expended money based on the agreement, and, in fact, extending the SVEA period until February 22, 2013, only helped them because no additional collateral was required while the SVEA was in effect. Additionally, not taking action against defendants because of the agreement was not significant and substantial because plaintiffs could still have done so once the Policy was cancelled. Second, plaintiffs fail to plausibly allege any conduct incompatible with the Note. The Note did not require First Insurance Funding or Barrington to cancel the Policy at a certain time. Nor did the Note state that plaintiffs could not extend the SVEA beyond its initial expiration. Moreover, the Note did not govern Minnesota Life's conduct. It was free to agree to extend the SVEA without contradicting the Note's terms. Thus, plaintiffs' argument for equitable estoppel does not save their breach-of-contract claim, which fails to state a claim upon which relief can be granted.

29

4.

In their fourth claim for relief, plaintiffs allege that First Insurance Funding and Barrington owed them a duty of good faith and fair dealing "under either the contracts relating to the Loan or the parties' agreement not to cancel the Policy until February 22, 2013," a duty defendants allegedly breached by cancelling the Policy on February 12, 2013. Compl. ¶ 128. Because plaintiffs fail to plausibly allege the existence of an enforceable agreement not to cancel the Policy until February 22, 2013, they fail to state a claim upon which relief can be granted for breach of a duty of good faith and fair dealing owed under that alleged agreement.

5.

Even assuming the statute of limitations does not bar plaintiffs' claims for unfair and deceptive trade practices, plaintiffs fail to state a claim upon which relief can be granted. Plaintiffs base their UDTPA claim on two theories. See Compl. ¶¶ 131–40. First, they claim defendants violated N.C. Gen. Stat. § 58-63-15, which prohibits "[m]aking, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby." N.C. Gen. Stat. § 58-63-15(1); see Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 69, 529 S.E.2d 676, 682 (2000). Second, they claim defendants violated N.C. Gen. Stat. § 75-1.1 by engaging in unfair, deceptive, or fraudulent acts by providing false and misleading illustrations.

"In order to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). For UDTPA claims based on misrepresentations, plaintiffs must also plausibly allege that they reasonably relied upon the

30

misrepresentation. Bumpers v. Cty Bank of N. Va., 367 N.C. 81, 89, 747 S.E.2d 220, 227 (2013).

Plaintiffs' section 58-63-15 claim cites illustrations "misrepresenting the terms of any policy," and

plaintiffs' fraud-based claim under section 75-1.1 alleges that defendants misrepresented the Policy's

terms by providing false and misleading illustrations. Plaintiffs' UDTPA claims, however, fail for

the same reason as their fraud and negligent-misrepresentation claims: plaintiffs could not have

reasonably relied on the alleged misrepresentations contained in the illustrations because the Policy

contradicted them.

6.

Even assuming the statute of limitations does not bar plaintiffs' claim for breach of contract

based on the illustrations being part of the Policy and Loan contracts, plaintiffs nonetheless fail to

state a claim upon which relief can be granted. Plaintiffs claim that the various illustrations were

part of the Policy and Loan contracts, which defendants breached by failing to administer the Policy

and Loan consistent with the illustrations. Compl. ¶¶ 141–44.

To prove a breach of contract, "a plaintiff must show a valid contract existed, and a breach

of its terms." Nelson v. Hartford Underwriters Ins. Co., 177 N.C. App. 595, 606, 630 S.E.2d 221,

229 (2006). "Where the parties have deliberately put their engagements in writing in such terms as

imports a legal obligation free of uncertainty, it is presumed the writing was intended by the parties

to represent all their engagements as to the elements dealt with in the writing." Clifford v. River

Bend Plantation, Inc., 312 N.C. 460, 464, 323 S.E.2d 23, 25 (1984) (alteration and quotation

omitted).

Plaintiffs fail to plausibly allege that either the August 2009 Illustration or Minnesota Life

March 2010 Illustration formed part of the contract consisting the Policy. "When examining whether

an insurance policy is breached, [courts] begin with the well-settled principle that an insurance policy

31

is a contract and its provisions govern the rights and duties of the parties thereto." Nelson, 177 N.C. App. at 606, 630 S.E.2d at 229 (quotation omitted); see Greene v. Nationwide Mut. Fire Ins. Co., No. 4:13-CV-255-D, 2014 WL 6694049, at *2 (E.D.N.C. Nov. 26, 2014) (unpublished); Fid. Bankers Life Ins. Co. v. Dortch, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986). Under the heading titled "What is your agreement with us?" the Policy states that: "Your policy, or any change to it, contains the entire contract between you and us. This includes the initial application and all subsequent applications to change your policy." [D.E. 17-1] 13. The Policy as issued does not include the illustrations. The illustrations were "not referred to in the policy, and [were] not even attached to it." Graham v. Mut. Life Ins. Co. of N.Y., 176 N.C. 313, 97 S.E. 6, 7 (1918). The Policy's merger clause "clearly excludes from the agreement everything not included in the writing" and representations made before the parties executed the contract cannot change its terms. See Clifford, 312 N.C. at 464, 323 S.E.2d at 25; Graham, 176 N.C. at 313, 97 S.E. at 7; cf. Frith v. Guardian Life Ins. Co. of Am., 9 F. Supp. 2d 734, 739–40 (S.D. Tex. 1998).

The Policy also provides that "[n]o change or waiver of any of the provision of this policy will be valid unless made in writing by us and signed by our president, a vice president, our secretary or an assistant secretary." [D.E. 17-1] 13. It explicitly states that "[n]o agent or other person has the authority to change or waive any provisions of your policy." Id. Plaintiffs, however, allege that defendants' agents provided them with the illustrations, and do not allege that the illustrations bore the signature of the parties required to sign the illustrations to make them part of the Policy. Plaintiffs therefore fail to plausibly allege that the contract for the Policy contained the illustrations.

Alternatively, the illustrations concerning the Policy fail to meet the requirements of contract formation. To prove that a valid contract existed, the plaintiff must show that "there has been a meeting of the minds as to all essential terms of the agreement." Carcano v. JBSS, LLC, 200 N.C.

32

App. 162, 168, 684 S.E.2d 41, 48 (2009). A meeting of the minds, or mutual assent, exists if the parties "manifest an intent to be bound." Parker v. Glosson, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007); see Se. Caissons, LLC v. Choate Const. Co., 784 S.E.2d 650, 656 (N.C. Ct. App. 2016). The August 2009 Illustration attached to the complaint is incomplete and cannot be the basis for a breach-of-contract claim. That illustration states that it "is valid only when accompanied by a complete Basic Illustration," which plaintiffs did not attach. See Compl. Ex. A at 25–28. That the illustration lacked pages making it complete undermines any argument that it evidenced defendants' intent to be bound by it. See Hunton v. Guardian Life Ins. Co. of Am., 243 F. Supp. 2d 686, 714 n.50 (S.D. Tex. 2002), aff'd, 71 F. App'x 441 (5th Cir. 2003). Even had the illustration been complete, plaintiffs still could not plausibly allege the meeting of the minds required to form a valid contract. At the bottom of the illustration, it states that it is based on assumptions that are "not likely to occur and actual results may be more or less favorable than those shown." Id. at 27–28. Nowhere does the illustration contain language plausibly interpreted as manifesting the parties' intent to be bound by it, nor was it signed by the parties. That the parties continued to discuss the Policy and its terms for months after defendants allegedly provided the August 2009 Illustration helps defeat plaintiffs argument that the illustration bound defendants.

As for the Minnesota Life March 2010 Illustration, it explicitly states both that it is not a contract and is based on assumptions regarding the timing of premium payments that are subject to change:

> This is a life insurance illustration and not a contract. This illustration is intended to demonstrate the impact of premium payments and policy charges on the Accumulated Value and Death Benefit under a set of assumptions. This illustration is not intended to predict or project actual performance. This illustration reflects certain assumptions about the amount and timing of your premium payments and how you may utilize the policy's options. Your actual use of the policy is likely to vary from these assumptions and this will cause the actual policy performance to

differ from this illustration.

Compl. Ex. B at 33; see id. at 39–41. The signature page signed by the trustee explicitly stated that a representative told the trustee that the "interest credit assumptions" and other non-guaranteed elements were "subject to change, and could be higher or lower." Id. at 42.

As for First Insurance Funding and Barrington, plaintiffs fail to plausibly allege that the First Insurance Funding March 2010 Illustration depicting the maximum amount of additional required collateral as $165,673 is part of the Loan contract. Nowhere does the Note evidencing the Loan refer to or incorporate any illustrations, require First Insurance Funding and Barrington to administer the Note consistent with any illustrations, or provide that the Policy's collateral valuation must be consistent with any illustrations. The Note does show, however, that the amount of additional collateral required turns on multiple factors, rather than being capped at a set amount. See [D.E. 18-1] 7. Additionally, the First Insurance Funding March 2010 Illustration itself states that the "collateral projections" are based on certain assumptions, implying that they might change. See Compl. Ex. C at 44. Nowhere does the illustration contain language plausibly interpreted as manifesting the parties' intent that the illustration bind them. Accordingly, plaintiffs fail to state a claim upon which relief can be granted for the breach-of-contract claim alleged in their sixth claim for relief.

III.

In sum, plaintiffs' first, second, fifth, and sixth claims for relief are barred by the relevant statutes of limitation, or, alternatively, fail to state a claim upon which relief can be granted. Plaintiffs' third and fourth claims for relief fail to state a claim upon which relief can be granted. Accordingly, the court GRANTS defendants' motions for judgment on the pleadings [D.E. 20, 25].

34

SO ORDERED. This _8_ day of March 2017.

_Jam Dever_

JAMES C. DEVER III
Chief United States District Judge

35